IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
 )
   v. ) Civil No. 05-141 Erie
 )
CATHERINE Y. PEI )

**RESPONDENT'S RESPONSE TO UNITED STATES' MOTION TO ADJUDICATE
HER IN CONTEMPT, AND FOR INCARCERATION**

AND NOW, comes the respondent, Catherine Y. Pei, by her attorney, Thomas W. Patton,

Assistant Federal Public Defender, and respectfully files her Response to United States' Motion to

Adjudicate Her In Contempt and for Incarceration.  In support thereof Counsel states:

### I. BACKGROUND

The Internal Revenue Service (I.R.S.) is investigating Ms. Pei to determine her correct federal

income tax liabilities for tax years 1999 and 2000. During those years Ms. Pei filed joint returns with

her ex-husband, Robert Bynum.  The I.R.S. believes that Mr. Bynum was involved in what it calls

the "Rolls Royce or Cash 4Titles Ponzi scheme" during the relevant tax years.  See Department of

Treasury Internal Revenue Service Information Document Request, Document Request No. 2.

Attached as Respondent's Exhibit A is a Press Release issued by the Office of Maryland Attorney

General J. Joseph Curran, Jr., discussing the Cash 4 Titles ponzi scheme and Robert Mark Bynum

IV's role in the scheme.  The Attorney General's office claimed that the ponzi scheme raised

$300,000,000 from investors over several years and that Mr. Bynum agreed to pay $71,500 in

restitution to victims of the scheme.

Ms. Pei was asked questions regarding the Cash 4 Titles scheme during her appearance

before Agent Dickerson.  (T. 20:23)  While not explicitly admitting to it, it is clear that the I.R.S.

believes Mr. Bynum received income from the ponzi scheme that he did not report to the I.R.S. Furthermore, it is clear that the I.R.S. thinks, but as will be discussed in detail below, does not know for sure, that non-reported, taxable income was laundered through an account at Leadenhall Trust Company Ltd. located in the Bahamas.

The Declaration of Barbara Kallenberg, Technical Advisor on the Offshore Credit Card Project, attached to the government's petition to enforce its summons, explains how U.S. taxpayers place funds in a bank account "at a bank in a financial secrecy jurisdiction," like Leadenhall, and then use a credit card issued by that bank to use the money to make purchases in the United States. These offshore accounts allow United States taxpayers to funnel unreported money out of the United States, into the bank account in the bank in a "financial secrecy jurisdiction," and then back into the United States through the "credit card." That is what the I.R.S. believes Mr. Bynum was doing with at least some of the unreported earnings he had from the Cash 4 Titles ponzi scheme. It is rather obvious that the scheme depends upon the fact that the bank that issues the credit card is in a "financial secrecy jurisdiction" which prevents the I.R.S. from using its summons power to obtain bank records.

To investigate their suspicion, the I.R.S. issued a summons to Mr. Bynum and Ms. Pei, requesting, among other things, detailed documents concerning any foreign credit card or bank account held by either Mr. Bynum or Ms. Pei. Unlike the bank accounts Mr. Bynum and Ms. Pei had in the United States, the I.R.S. could not obtain records from Leadenhall because it is in a "financial secrecy jurisdiction." Ms. Pei did not appear at the date and time required by the summons, so the I.R.S. filed a petition to enforce the summons. The Court held a hearing on the government's petition at which the parties agreed that Ms. Pei would appear pursuant to the

2

summons to "give testimony and produce for examination and copying the items demanded in the summons relating to any foreign credit card or bank account and which have not been identified as already in the possession of the Internal Revenue Service." Court Order of August 8, 2005, attached as Respondent's Exhibit B. Ms. Pei reserved her right to invoke her Fifth Amendment privilege against self-incrimination on a question-by-question basis. Id.

On August 31, 2005, Ms. Pei and her counsel appeared before Revenue Agent Shannon Dickerson. On that date Ms. Pei invoked her Fifth Amendment privilege, on a question-by-question basis. Ms. Pei refused to answer questions concerning her and her ex-husband's income during tax years 1999 and 2000, and also declined to produce any records requested in the summons because answering the questions or producing the documents may incriminate her. The government has now filed a motion asking this Court to hold Ms. Pei in contempt for exercising her Fifth Amendment privilege. Because Ms. Pei's invocation of her Fifth Amendment privilege was proper, the Court should deny the government's motion.

## II.  MS. PEI PROPERLY INVOKED HER FIFTH AMENDMENT PRIVILEGE

The government is wrong in claiming that Ms. Pei herself must invoke her Fifth Amendment right against self incrimination. United States v. Schmidt, 816 F.2d 1477, 1481 n.3 (10th Cir. 1987), does support the government's position, however, its reasoning is so obviously wrong this Court should not find the case persuasive. In support of its statement, in a footnote, that a defendant's attorney cannot invoke the defendant's Fifth Amendment privilege, Schmidt, cites Couch v. United States, 409 U.S. 322, 328, 93 S.Ct. 611, 616 (1973), and Kastigar v. United States, 406 U.S. 441, 445, 92 S.Ct. 1653, 1656 (1972), for the proposition that the Fifth Amendment privilege is a personal privilege. Schmidt, 816 F.2d at 1481 n.3. That is true so far as it goes. In Couch, the IRS had issued

3

a summons to the taxpayer's accountant seeking information in the accountant's possession regarding the taxpayer. The taxpayer tried to block the accountant's compliance with the summons by invoking her Fifth Amendment privilege. The Supreme Court rejected this argument because the summons did not try to force the taxpayer to provide incriminating evidence against herself, which would violate the Fifth Amendment, but rather sought information from the accountant and the accountant made no claim that complying with the summons would incriminate him. Couch, 409 U.S. at 328-29, 93 S.Ct. 616. Kastigar had nothing to do with whether an attorney could invoke the client's Fifth Amendment privilege on the client's behalf.

Schmidt confuses the fact that the Fifth Amendment is a personal right, meaning a defendant can only invoke the right if she claims she is being forced to be a witness against herself, with the fact that an attorney, as the agent of a defendant, can invoke, on the client's behalf, the client's claim that the client is being forced to be a witness against herself. Attorneys invoke client's personal rights routinely. That's what attorneys do. What an attorney can not do is try to resist turning over information they might have about their clients to the government by trying to invoke the client's Fifth Amendment privilege. That's the point being made in United States v. Haddad, 527 F.2d 537, 539 (6th Cir. 1975) ("The privilege does not permit an attorney to plead that his client might be incriminated by [the attorney's] testimony."), mis-cited by the government in support of its claim that Ms. Pei did not properly invoke her Fifth Amendment privilege.

Finally, Torres v. Kuzniasz, 936 F.Supp. 1201, 1211 (D.N.J. 1996), is readily distinguishable. Torres involved an attempt by a law enforcement defendant in a civil rights suit to avoid discovery of police internal investigation files by claiming executive or law enforcement privilege, officer's privilege as recognized in Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616 (1967), and the

4

Fifth Amendment privilege as it pertained to individual law enforcement officers. Id. at 1207-09. In rejecting the claim of privilege under Garrity and the Fifth Amendment, the court stated that those privileges had to be invoked by individuals, and not counsel. Id. at 1211. The court supported that statement by citing United States v. O'Neill, 619 F.2d 222, 226 (3rd Cir. 1980). O'Neal dealt with the United States Civil Rights Commission's attempts to subpoena documents from Joseph O'Neill, then Commissionier of the Philadelphia Police Department, and Frank A. Scafidi, then Chief Inspector, Internal Affairs Bureau of the Philadelphia Police Department involving investigations into reports of alleged brutality on the part of named police officers. Id. at 224. O'Neill and Scafidi refused to provide documents claiming, in part, that the documents were covered by executive privilege and production would violate the Fifth Amendment rights of the named officers. Id. at 225. As far as the Fifth Amendment was concerned, the Third Circuit rejected the Fifth Amendment claim because "there [was] no indication that either Commissioner O'Neill or Inspector Scafidi [were] claiming the privilege of self-incrimination on his own behalf."

The point being made in Kuzniasz is that a broad invocation of the Fifth Amendment by counsel in civil litigation is not proper. O'Neill is nothing more than another case stating that a person cannot assert that they can not be compelled to provide evidence to the government because it may incriminate someone else.

In this case Ms. Pei personally appeared before Agent Dickerson, with counsel, and through counsel invoked her Fifth Amendment privilege on a question-by-question basis. That is a proper invocation of the privilege. If the Court finds that Ms. Pei herself has to speak the words invoking her Fifth Amendment privilege, however, and the government wants to fly Agent Dickerson back to Erie for another appearance, Ms. Pei will appear with counsel and, at the direction of counsel, will

herself invoke her Fifth Amendment privilege on a question-by-question basis, but that seems a rather silly way to proceed.

### III.  THE FIFTH AMENDMENT PROHIBITS THE GOVERNMENT FROM COMPELLING MS. PEI TO PROVIDE DOCUMENTS THAT MAY INCRIMINATE HER

Ms. Pei acknowledges that current Supreme Court case law holds that the Fifth Amendment privilege does not apply to the content of business records and personal papers,  United States v. Hubbell, 530 U.S. 27, 34-36, 120 S.Ct. 2037, 2042-43 (2000), and that this Court must apply that law.  To preserve the issue for further review, however, Ms. Pei argues that the meaning of the word witness, as used in the Fifth Amendment, and at the time of the founding, means a person who gives or furnishes evidence.  Id. at 49-50, 2050 (Thomas, J. concurring).  Under this definition of witness, compelling Ms. Pei to provide any documents that may incriminate her to the government would violate her privilege against self-incrimination.

### IV.  PRODUCING THE DOCUMENTS CREATES A SUBSTANTIAL LIKELIHOOD OF SELF-INCRIMINATION

Initially, Ms. Pei makes clear that she does not admit that any of the documents sought by the summons actually exit.  In this filing Ms. Pei refers to the documents sought by the government so that she can explain why she has a well grounded fear that producing those documents, if they exist, might incriminate her.  These arguments do not admit the existence of the documents.

The government's own filings in this case make it painfully obvious that there is a substantial likelihood that complying with the summons would incriminate Ms. Pei.  This case arises out of the I.R.S.'s Offshore Credit Card Project which is "an on-going effort to identify persons who conceal taxable income by transferring funds to offshore jurisdictions and then use credit or payment cards to access these funds in the United States.  Kallenberg Declaration ¶ 3.  The whole point behind

6

trying to get information about the Leadenhall account in this case is to try to establish that Mr.

Bynum and Ms. Pei concealed taxable income in tax years 1999 and 2000 and did not report that

income to the I.R.S. on their tax returns.  And, in this case, the I.R.S. knows Mr. Bynum had a source

of unreported income, the Cash 4 Titles ponzi scheme.  Obviously, the I.R.S. believes, and is trying

to prove through the use of the summons in this case, that Mr. Bynum and Ms. Pei received taxable

income from the ponzi scheme, tried to conceal that taxable income by using an account at

Leadenhall, and did not report the taxable income.  To prove that Mr. Bynum and Ms. Pei had

taxable income that was not reported, the I.R.S. has to gather financial information concerning Mr.

Bynum's and Ms. Pei's spending in tax years 1999 and 2000 to prove through expenditures made

by Mr. Bynum and Ms. Pei that they spent more money than they reported earning.  Accordingly,

having account information from Leadenhall, or having Ms. Pei give oral testimony concerning any

source of income she and Mr. Bynum may have had in tax years 1999 and 2000 could be used by

the I.R.S. and the Department of Justice to bring charges of income tax evasion in violation of Title

26 U.S.C. § 7201 or filing false returns in violation of Title 26 U.S.C. § 7206(1).

While current Supreme Court case law holds that the Fifth Amendment privilege does not

protect the content of voluntarily prepared business records, it also holds that the act of producing

documents in response to an official government request may have a compelled testimonial aspect.

United States v. Hubbell, 530 U.S. 27, 36, 120 S.Ct. 2037, 2043 (2000).  The act of production

implicitly communicates statements of fact: by producing documents in compliance with the request,

the witness would admit that the papers existed, were in her possession or control, and were

authentic.  Id.  Additionally, as was attempted in this case, the witness may be compelled to answer

questions designed to determine whether she has produced everything demanded by the summons.

7

In this case there is an additional wrinkle. The government has not yet been able to establish that the Leadenhall credit card at issue in this case was owned, maintained, or used by Ms. Pei. Accordingly, compelling Ms. Pei to comply with the summons would provide the government with a link in the chain of evidence needed to prosecute her for a federal crime.

Since the government can not establish that the Leadenhall account at issue belonged to Ms. Pei, compelling Ms. Pei to comply with the summons would incriminate her both because it would be an admission that she did in fact own and control the account, and it would provide the government the link it needs to establish that the account belonged to Ms. Pei. Furthermore, absent Ms. Pei providing the Leadenhall records to the I.R.S., the I.R.S. has no way to authenticate the documents. The I.R.S. can not get the documents itself from Leadenhall because it is in the Bahamas which is a financial secrecy jurisdiction. The point behind the offshore credit card is that the bank issuing the card is in a financial secrecy jurisdiction which means that I.R.S. can not force the bank to turn over records. As such, compelling Ms. Pei to comply with the summons relieves the I.R.S. of the burden of authenticating the documents which is a burden it could not overcome absent Ms. Pei's compelled testimony.

1.     The Government does not know whether Ms. Pei owned or used the Leadenhall MasterCard.

The government's claim that it has determined that Ms. Pei owned, maintained and/or used a MasterCard credit card, Account No. 5482-82**-****-2511 issued by Leadenhall is not true. In truth, the government does not know whether or not Ms. Pei, the respondent in this case, owned, maintained and/or used a MasterCard credit card, account number 5482-82**-****-2511 issued by Leadenhall.

The government's claim that Ms. Pei did own and use a Leadenhall issued MasterCard, made on page 2 of its Memorandum of Points and Authorities in Support of the motion to hold Ms. Pei in contempt, purports to be supported by paragraph 7 of Revenue Agent Dickerson's declaration filed in support of the original Petition to Enforce Internal Revenue Service Summons.  Agent Dickerson's Declaration does claim in paragraph 7 that the I.R.S.'s examination of Ms. Pei "has revealed that, during the years at issue, Pei owned, maintained and/or used a MasterCard credit card, Account No. 5482-82**-****-2511, issued by Leadenhall Trust Comapny, Ltd. (a/k/a Axxess International Bahamas, Ltd.) ("Leadenhall"), located in the Bahamas."  That claim, however, is not supported by any facts.  That claim purports to be supported by the declarations of Barbara Kallenberg and Giksa D. Gonzalez which were also filed in support of the Petition to Enforce Internal Revenue Service Summons.  A review of the information contained in Ms. Kallenberg's and Ms. Gonzalez' declarations reveals that the I.R.S. **has not** established that the Catherine Pei who is the respondent in this case owned, maintained and/or used a MasterCard credit card issued by Leadenhall.

Kallenberg's declaration states that through the use of a John Doe summons served upon MasterCard International, the I.R.S. identified United States taxpayers who held payment cards issued by offshore banks.  One of the offshore banks identified as issuing MasterCard payment cards was Leadenhall Bank and Trust Company.  The MasterCard credit cards issued by Leadenhall have Bank Identification Numbers of 5481-94 or 5482-82.  Kallenberg's declaration does not state that information received from MasterCard International stated that Catherine Pei held a MasterCard issued by Leadenhall.

Gonzalez' declaration states that she works for Credomatic of Florida, Inc. ("Credomatic")

9

which is a credit card processing company. MasterCard used Credomatic to process information pertaining to its credit cards issued by certain banks. From 1998 through 2003, Credomatic had an agreement with Leadenhall to process transactions pertaining to MasterCard credit cards issued by Leadenhall to its customers. Credomatic electronically received information concerning the use of Leadenhall's MasterCards, stored that information electronically, and created monthly statements based upon that information. Credomatic keeps the credit card monthly statements for three years.

Attached to Gonzalez' declaration is a copy of a summons issued by the I.R.S. and served upon Credomatic on April 1, 2003. The summons commanded Credomatic to provide three categories of documents. First, the summons commanded Credomatic to provide "any and all documents" in its possession "related to credit card number 5482-82**-****-2511, issued by Leadenhall Trust Company Ltd. For the period beginning March 1, 1998, through the date of compliance with this summons" and provides a detailed list of the type of documents sought. The first category of documents specifically listed was

> [a]ll 'Account General Information' statements or other documents revealing cardholder identity, the identification of all persons authorized use of the card [sic] and any guarantor of the card account, including any billing, residential or other address, phone numbers, email addresses and all other contact information.

Second, the summons commanded Credomatic to provide "any and all documents" in its possession "related to any other credit, debit, or charge cards, regardless of brand or issuing bank, in the name of **Catherine Bynum**" and listed the same set of documents listed in the first request. Third, the summons commanded Credomatic to provide information about any owner, co-owner, authorized card user and guarantor identified in the documents requested in paragraphs 1 and 2, other than Catherine Bynum.

10

In response to the I.R.S. summons, Credomatic provided monthly statements for account number 5482-82**-****-2511 which are attached to Gonzalez' declaration. Gonzalez' declaration explains that the first page of the documents provided by Credomatic is entitled "Account General Information." Gonzalez further explains that "[g]enerally this page serves as Credomatic's record of owners and authorized signatories on an account, but in this case, the document states 'Account entered does not exist in files.'" Gonzalez further explains that when an account is closed for more than six months with no outstanding balance, Credomatic purges the information in the "Account General Information" and that Credomatic has no way to recover the information. So, Gonzalez' declaration establishes that it does not know, and therefore the I.R.S. does not know, who the owner or authorized signatories were on account number 5482-82**-****-2511. The monthly statements for account number 5482-82**-****-2511 for the time period of March 1998 through April 1999 were mailed to Catherine Y. Pei, PO Box 1210, Millersville, Maryland 21108. The monthly statements for the time period of May 1999 through February 2001 were mailed to Catherine Y. Pei, PO Box 12388, Silverspring, Maryland 209080000.

Gonzalez' declaration does not show any documents in Credomatic's possession concerning Catherine Bynum or any owner, co-owner, authorized card user and guarantor identified in the documents requested in paragraphs 1 and 2 of the summons. Thus, the only information provided by Credomatic to the I.R.S. in response to the I.R.S. summons was information linked to account number 5482-82**-****-2511 as requested in paragraph 1 of the summons. This raises a troubling issue with Gonzalez' declaration. Paragraph 9 of the declaration states that the documents attached to the declaration, which were the monthly statements for account number 5482-82**-****-2511, were printed and produced by Credomatic in response to the I.R.S. summons. The declaration then

11

states that the "summons sought, among other things, 'all documents in your [Credomatic's] possession or under control related to any credit, debit, or charge cards, regardless of brand or issuing bank, in the name of Catherine Bynum, over which she has signature authority, over which she is a guarantor, or over which she exercises control . . . ." This makes it seem like Credomatic produced the monthly statements for account number 5482-82**-****-2511 in response to the summons' command to produce documents related to charge cards over which Catherine Bynum had signature authority or were under her control. That is misleading and untrue. Credomatic had no information concerning any accounts controlled by Catherine Bynum. The monthly statements provided by Credomatic in response to the summons were provided in response to the summons' command for documents related to account number 5482-82**-****-2511 and there is no record of who owned or had signature authority on that account. Gonzalez' declaration is written in a way to mislead the reader into believing that Credomatic's records indicate that Catherine Bynum was the owner of account number 5482-82**-****-2511 when that is not the case.

In summary, the only information obtained by the I.R.S. from either MasterCard International and Credomatic concerning the MasterCard credit card number 5482-82**-****-2511 issued by Leadenhall is that: 1) the card was issued, and 2) it is not known who the card was issued to or who the authorized signatories where on the account, and 3) monthly statements were mailed to Catherine Y. Pei at various post office boxes in Maryland.

Agent Dickerson's declaration claims that Ms. Pei used the Leadenhall credit card associated with account number 5482-82**-****-2511 to purchase goods and services in the Rockville, Maryland area. However, Agent Dickerson's claims are supported only by copies of receipts from businesses in the Rockville, Maryland area showing that someone used the credit card to purchase

goods and services.  Agent Dickerson's declaration does not provide any explanation as to how the I.R.S. has established that it was Catherine Pei, the respondent in this case, who used the credit card. It appears that Agent Dickerson has simply assumed that Catherine Pei, the respondent in this case, was the person who used the credit card.  That assumption cannot substitute for evidence that actually establishes that the person who used the card was the Catherine Pei who is the respondent in this case.

The I.R.S. has failed to establish that Ms. Pei ever owned, maintained or used a Leadenhall MasterCard.  Accordingly, forcing Ms. Pei to comply with the summons would force her to admit that she did in fact own, maintain or use the Leadenhall MasterCard and that the documents being provided pursuant to the summons were documents related to **her** account at Leadenhall.  Indeed, forcing Ms. Pei to comply with the summons would force her to provide the link that the I.R.S. currently lacks, *i.e.* that Ms. Pei in fact owned and used the Leadenhall MasterCard.  That act, in and of itself, would violate Ms. Pei's Fifth Amendment right against self-incrimination separate and apart from the testimonial aspect of admitting that the documents exist inherent in complying with the summons.  Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818 (1951) ("The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime.").

The Third Circuit addressed these very issues in Matter of Grand Jury Empanelled March 19, 1980, 680 F.2d 327 (3rd Cir. 1982), *rev'd on other grounds sub nom.* United States v. Doe, 456 U.S. 605, 104 S.Ct. 1237 (1984).  In that case the grand jury was investigating corruption relating to the awarding of county and municipal contracts.  Id. at 328.  The grand jury issued five subpoenas duces

13

tecum commanding the defendant to appear before the grand jury and provide numerous documents

concerning two of his businesses, including all records connected with specified bank accounts of

the defendant or his companies.  Id.  The defendant moved to quash the subpoenas on Fifth

Amendment grounds.  The district court granted the motion to quash with minor exceptions finding

that the act of producing the documents would be communicative by admitting the documents

existed, that they were in the defendant's possession, and that they were authentic.  Id.

On appeal, the Third Circuit affirmed.  The Third Circuit rejected an argument that the

existence of the documents was a foregone conclusion under Fisher in language that is applicable

in this case.

> [W]e find nothing in the record that would indicate that the United States knows, as
> a certainty, that each of the myriad documents demanded by the five subpoenas in
> fact is in the appellee's possession or subject to his control.  The most plausible
> inference to be drawn from the broad-sweeping subpoenas is that the Government,
> unable to prove that the subpoenaed documents exist–or that the appellee even is
> somehow connected to the business entities under investigation–is attempting to
> compensate for its lack of knowledge by requiring the appellee to become, in effect,
> the primary informant against himself.

Matter of Grand Jury, 680 F.2d at 335.  In a footnote, the Court noted that at oral argument the

government had conceded that the grand jury had been unable to link the defendant and the

businesses with respect to which documents were sought by the grand jury.  Id. at 335 n.12.  Based

on that admission, the Court found that "[t]o the extent, then, that ordering the appellee to comply

with the subpoenas would furnish the United States with a 'missing link' in its evidentiary chain–i.e.,

information that the appellee in fact operates the businesses and holds the bank accounts under

review–a further incriminating testimonial communication would arise."  Id.  This case mirrors

Matter of Grand Jury in that the government can not prove that the documents it has summoned

14

exist, and the government can not link Ms. Pei to Leadenhall credit card number 5482-82\*\*-\*\*\*\*-2511 and is trying to use the I.R.S. summons to provide the missing link.  So, not only is the government trying to force Ms. Pei to admit the existence of records that could incriminate herself, it is also seeking to use that admission to prove that the accounts the records pertain to were Ms. Pei's.

> 2.     The government can not authenticate the Leadenhall records without Ms. Pei's compelled testimony.

Leadenhall is a Bahamian bank.   The Bahamas is a financial secrecy jurisdiction.  Accordingly, the I.R.S. has no way of independently obtaining or authenticating records from Leadenhall.  Compelling Ms. Pei to provide the documents to the I.R.S. would relieve the I.R.S. of the need for authentication.  The Supreme Court has addressed this issue in  United States v. Doe, supra.  Doe was the Supreme Court's review of the Third Circuit's decision in Matter of Grand Jury discussed above.  While the Supreme Court reversed the Third Circuit's holding that the owner of a sole proprietorship retained a Fifth Amendment privilege in the contents of his business' records, the Supreme Court agreed with the Third Circuit's finding that the act of producing the documents would involve testimonial self-incrimination.   The Supreme Court specifically discussed the authentication issue stating as follows:

> Respondent also pointed out that if the Government obtained the documents from another source, it would have to authenticate them before they would be admissible at trial.  See Fed.Rule Evid. 901.  By producing the documents, respondent would relieve the Government of the need for authentication.   These allegations were sufficient to establish a valid claim of the privilege against self-incrimination.

Id. at 614 n.13, 104 S.Ct. 1243 n.13. The same rationale applies to Ms. Pei's case.  The Supreme Court did acknowledge that the government could have rebutted  the respondent's claim by

15

producing evidence that possession, existence, and authentication were a "foregone conclusion" under <u>Fisher v. United States</u>, 425 U.S. 391, 411, 96 S.Ct. 1569, 1581 (1976), but found that the government had failed to do so. <u>Id</u>. As will be discussed below, contrary to the government's assertions in this case, it has not established that existence, possession and authentication of the Leadenhall documents are a foregone conclusion.

      3.      The government has not proven that the existence, possession and authentication of the Leadenhall documents are a foregone conclusion.

The government attempts to vitiate Ms. Pei's Fifth Amendment privilege by arguing that the existence, possession and authentication of the Leadenhall documents is a foregone conclusion under <u>Fisher</u>. The government's foregone conclusion arguments goes as follows: Ms. Pei owned, maintained and used a MasterCard credit card issued by Leadenhall Bank and Trust Company; Leadenhall requires people who have one of their MasterCards to have an account at the bank securing the card; Leadenhall keeps records regarding its customers' accounts; customers can obtain their records upon request from Leadenhall; therefore it is a foregone conclusion that the Leadenhall records exist, are in Ms. Pei's possession and are authentic.

There are four problems with the government's argument. First, it is factually incorrect. As discussed previously, the government can not prove that Ms. Pei owned, maintained or used a MasterCard credit card issued by Leadenhall. Second, even if the government could prove that Ms. Pei owned, maintained or used a MasterCard credit card issued by Leadenhall, Supreme Court case law establishes that that fact, in and of itself, can not establish that the existence of the summoned documents is a foregone conclusion. Third, the government has not provided **any** explanation as to how it could authenticate the summoned documents absent Ms. Pei's compliance with the summons.

Fourth, even if it is a foregone conclusion that the documents exist, are under Ms. Pei's control and are authentic such that the act of producing the documents in and of itself is not incriminating, because providing the documents would provide a link in the chain of evidence needed to prosecute Ms. Pei, by establishing that she is the person who owned, maintained and used the Leadenhall account, she can not be compelled to produce the documents.

          i.      The government has not proven that Ms. Pei had an account at Leadenhall.

Ms. Pei has already explained at length how the government has failed to establish that she had an account with Leadenhall. Without that showing, the government's foregone conclusion argument is dead on arrival. If Ms. Pei did not have an account with Leadenhall the summoned documents do not exist, can not be in Ms. Pei's control, and can not be authentic. Far from knowing for a certainty that these documents exist, the government is trying to make up for its lack of knowledge by forcing Ms. Pei to be the primary informant against herself. Matter of Grand Jury, 680 F.2d at 335.

          ii.     Even if the Court finds that the government has established that Ms. Pei used, maintained and controlled the Leadenhall MasterCard, that does not establish that the existence of summoned documents is a foregone conclusion.

The government's foregone conclusion arguments boils down to the claim that since Leadenhall generally keeps business records concerning customers' accounts and Ms. Pei had an account with Leadenhall it is a foregone conclusion that the summoned documents exist. The Supreme Court rejected this very argument in Doe and Hubbell.

The subpoenas at issue in both Doe and Hubbell, sought large categories of business records including records related to bank accounts. Doe, 465 U.S. at 606-07, 104 S.Ct. at 1239; Hubbell, 530 U.S. at 46-49, 120 S.Ct. 2049-50. One of the subpoenas at issue in Doe required the production

of "'all records, including but not limited to bank statements, cancelled checks, check stubs and deposit tickets' connected with **specified bank accounts of the appellee or his companies** . . . ." Matter of Grand Jury, 680 F.2d at 328; Doe, 465 U.S. at 607, 104 S.Ct. 1239 ("The final subpoena demanded production of all bank statements and cancelled checks of two of respondent's companies that had accounts at a bank in the Grand Cayman Islands.").  In both cases the Supreme Court rejected a foregone conclusion argument made by the government.  The Hubbell opinion explains why it was not a foregone conclusion that the records existed.

> While in Fisher the Government already knew that the documents were in the attorneys' possession and could independently confirm their existence and authenticity through the accountants who created them, here the Government has not shown that it had any prior knowledge of either the existence or the whereabouts of the 13, 210 pages of documents ultimately produced by respondent.  The Government cannot cure this deficiency through the overbroad argument that a businessman such as respondent will always possess general business and tax records that fall within the broad categories described in this subpoena.  The Doe subpoenas also sought several broad categories of general business records, yet we upheld the District Court's finding that the act of producing those records would involve testimonial self-incrimination.

Hubbell, 530 U.S. at 44-45, 120 S.Ct. 2048.

The District of Columbia Circuit's opinion in the Hubbell case, affirmed by the Supreme Court explains why the government's claim in this case, that the existence of the documents is a foregone conclusion because Leadenhall has kept records for other customers' accounts it must have done the same for Ms. Pei's, is wrong both logically and legally.  Before the District of Columbia Circuit the Independent Counsel made the same argument as the government in this case with regard to Fisher's foregone conclusion exception: people in Hubbell's position normally keep general business records therefore the existence of the records should be regarded as a foregone conclusion. United States v. Hubbell, 167 F.3d 552, 769-70 (D.C. Cir. 1999).  The District of Columbia Circuit

18

rejected the Independent Counsel's argument explaining:

> The argument makes the classical error in the field of logic of assuming that the occurrence of future events can be logically deduced from observations rooted in the past. Empirical knowledge, as David Hume and Buertrand Russell teach, can only be *a postiori*, not *a priori*. See David Hume, <u>Enquiries Concerning the Human Understanding and Concerning the Principles of Morals</u>, § IV (L.A. Selby-biggs ed., 1980); Bertrand Russell, <u>The Problems of Philosophy</u>, 60-69 (Galaxy 1959) (that the sun rose today and as far back as the mind remembers does not establish that it will rise tomorrow). Moreover, contrary to the Independent Counsel's characterization, the Supreme Court's cases reflect such an understanding, and require actual knowledge rather than mere inductive generalizations.

<u>Id</u>.

The government does not know for a certainty that Leadenhall has any records relating to the MasterCard credit card account number 5482-82**-****-2511 or any account linked to that card. The government is assuming that such records exist because records have existed for other accounts at Leadenhall. Kallenberg Declaration ¶ 8c. However, the Supreme Court has rejected this government tactic, and this Court must as well.

The Eighth Circuit's ruling in <u>United States v. Norwood</u>, 420 F.3d 888 (8th Cir. 2005), is not binding on this Court and should be rejected. <u>Norwood</u> ignores the Supreme Court's ruling in <u>Doe</u> and falls for the false logic that since Leadenhall has kept records with regard to some accounts investigated by the I.R.S., it is a foregone conclusion that such records exist for every account. Ms. Pei has already explained why that reasoning is false and has been rejected by the Supreme Court. The fact that the government knows the name and location of the bank at issue and the account numbers of the accounts at issue is irrelevant. <u>Norwood</u>, 420 F.3d at 896. In <u>Doe</u> the government subpoena sought records from **"specified bank accounts of the appellee or his companies** . . . ." <u>Matter of Grand Jury</u>, 680 F.2d at 328; <u>Doe</u>, 465 U.S. at 607, 104 S.Ct. 1239 ("The final subpoena

demanded production of all bank statements and cancelled checks of two of respondent's companies that had accounts at a bank in the Grand Cayman Islands.")   Despite this fact the Supreme Court upheld the district court's finding that producing the records would involve testimonial self-incrimination.  Hubbell, 530 U.S. 45, 120 S.Ct. 2048.

Norwood is also factually distinguishable from Ms. Pei's case.  The defendant in Norwood, did "not dispute that the IRS ha[d] prior knowledge of two Leadenhall payment cards and one Leadenhall account controlled by him."  Norwood, 420 S.Ct. At 895.  Ms. Pei had made no such admission.

       iii.    The government has not established that the authenticity of the documents is a foregone conclusion.

Because this case involves documents being sought from a bank in a financial secrecy jurisdiction, the authentication aspect of producing the summoned documents takes on additional importance.  In Doe the Supreme Court found that once the target of the subpoena established that producing the documents would relieve the government of the requirement of authenticating the documents the burden shifted to the government to prove that the authentication of the documents was a foregone conclusion.  Doe, 465 U.S. at 614 n.13, 104 S.Ct. 1243 n.13.  Here the government has not presented **any** evidence or made **any** argument to explain how it could authenticate the summoned documents absent Ms. Pei's compelled production of the documents.  As the Supreme Court noted in Hubbell, in Fisher the Court found the authentication of the subpoenaed documents to be a foregone conclusion because they could be authenticated by the accountants who had created the records.  Hubbell, 530 U.S. at 44-45, 120 S.Ct. 2048.  That is not the case here.  The government has not established how they would be able to authenticate the documents without using Ms. Pei's

act of producing them in response to the subpoena.  No one from Leadenhall will authenticate the documents because the whole point of having Leadenhall in a financial secrecy jurisdiction is so that it can refuse to provide such information.  This is another reason to reject <u>Norwood</u>.  The Eighth Circuit never discusses the authenticity issue let alone explaining how the government could authenticate the documents absent their compelled production.

> iv.    Even if the existence, control and authenticity of the summoned documents are a foregone conclusion such that the act of producing the documents is not itself incriminating, because providing the documents would provide a link in the chain of evidence needed to prosecute Ms. Pei, she can not be compelled to produce the documents.

The Fifth Amendment privilege against self-incrimination "not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime."  <u>Hoffman</u>, 341 U.S. at 486, 71 S.Ct. at 818.  "Compelled testimony that communicates information that may 'lead to incriminating evidence' is privileged even if the information itself is not inculpatory."  <u>Hubbell</u>, 530 U.S. at 38, 120 S.Ct. 2044 (quoting <u>Doe v. United States</u>, 487 U.S. 201, 208 n.6, 108 S.Ct. 2341, 2346 n.6 (1988).

If the Court finds in this case that the existence of the summoned documents, Ms. Pei's control over the documents, and their authenticity is a foregone conclusion, then the act of producing those documents will not be incriminating.  However, because providing the documents will provide a link in the chain of evidence needed to prosecute Ms. Pei, Ms. Pei may still invoke her Fifth Amendment privilege.

Ms. Pei has already explained in detail that the government can not positively establish that she is the person who owned, maintained and used the Leadenhall MasterCard credit card with

account number 5482-82\*\*-\*\*\*\*-2511.  Compelling Ms. Pei to respond to the summons will provide the government with the evidence it needs to link Ms. Pei to the account.  See <u>Matter of Grand Jury</u>, 680 F.2d at 335 n.12 ("[t]o the extent, then, that ordering the appellee to comply with the subpoenas would furnish the United States with a 'missing link' in its evidentiary chain–*i.e.*, information that the appellee in fact operates the businesses and holds the bank accounts under review–a further incriminating testimonial communication would arise.").  Accordingly, Ms. Pei can not be compelled to provide the summoned documents.

### V.  THE COURT'S ORDER ENFORCING INTERNAL REVENUE SUMMONS DID NOT REQUIRE MS. PEI TO PROVIDE A COPY OF HER PASSPORT

This Court's Order Enforcing Internal Revenue Summons directed Ms. Pei to appear before Agent Dickerson "to give testimony and produce for examination and copying the items demanded in the summons relating to any foreign credit card or bank account and which have not been identified as already in the possession of the Internal Revenue Service."  Respondent's Exhibit B.  On page 5 of the government's Memorandum of Points and Authorities in support of its motion to hold Ms. Pei in contempt, the government lists the "items demanded in the summons relating to any foreign credit card or bank account" as referred to in this Court's order.  The items are identified by number as set forth in the Information Document Request attached to the summons.  As the government's papers correctly note, the numbered categories of documents that related to foreign credit card or bank accounts were categories 5, 6, 10, and 12.  None of those categories demanded the production of Ms. Pei's passport.  Item 13 in the Information Document Request does demand a copy of Ms. Pei's passport.  However, this Court did not order that part of the summons enforced. Accordingly, Ms. Pei need not provide the government a copy of her passport.

## VI.  MS. PEI PROPERLY INVOKED HER FIFTH AMENDMENT PRIVILEGE TO REFUSE TO ANSWER QUESTIONS PUT TO HER BY AGENT DICKERSON

The government makes a half-hearted attempt to argue that Ms. Pei's invocation of her Fifth Amendment privilege to refuse to answer questions put to her during Agent Dickerson's examination was not proper because there is not a substantial likelihood that answering the questions would incriminate Ms. Pei.[1]  Ms. Pei has explained in detail in Parts I and IV of this filing how providing information concerning her income for the tax years 1999 and 2000 or the Leadenhall account could be incriminating.  Those arguments will not be repeated here.

The government's statement that "while a criminal investigation into tax years 1999 and 2000 is not completely out of the question, at this stage, the investigation is entirely civil in nature" is meaningless.  The Fifth Amendment privilege can be invoked in any proceeding, civil, criminal, or administrative.  Kastigar, 406 U.S. at 444-445, 92 S.Ct. at 1656.  Thus, the nature of the proceeding is irrelevant.  The relevant question is whether answering the question could lead to self-incrimination.  "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."  Hoffman, 341 U.S. at 486-87, 71 S.Ct. at 818.  Given the setting of the questions at issue here, it is obvious that answering questions about the Leadenhall account and Ms. Pei's or her ex-husband's income during tax years 1999 and 2000 might be dangerous because injurious disclosure could result.

---

[1]The government's argument on this issue appears at pages 15 and 16 of its Memorandum of Points and Authorities even though the heading to the argument is "Pei's Invocation of Her Fifth Amendment Privilege Is Not a Valid Defense to Producing the Summoned Documents."

WHEREFORE, respondent, Catherine Y. Pei, respectfully requests that this Honorable Court deny the government's motion to adjudicate her in contempt.


Respectfully submitted,

/s/ Thomas W. Patton
Thomas W. Patton
Assistant Federal Public Defender
PA I.D. No. 88653